# EXHIBIT 1

| AOC-105        Doc. Code: CI | | Case No. |
| Rev. 1-07 | CIVIL SUMMONS | Court [✓] Circuit [ ] District |
| Page 1 of 1 | | County   Jefferson |
| Commonwealth of Kentucky | | |
| Court of Justice    www.courts.ky.gov | | |
| CR 4.02; CR Official Form 1 | | |

**PLAINTIFF**

PAMELA M. EASTRIDGE AS EXECUTRIX
OF THE ESTATE OF JOSEPH E. MORRIS, JR.

JEFFERSON CIRCUIT COURT
DIVISION EIGHT (8)

VS.

**DEFENDANT**

OLIN CORPORATION

190 Carondelet Plaza

Clayton, MO 63105

**Service of Process Agent for Defendant:**

CT CORPORATION SYSTEM
_____
306 W. Main Street
_____
Suite 512
_____
Frankfort, KY 40601
_____

THE COMMONWEALTH OF KENTUCKY
TO THE ABOVE-NAMED DEFENDANT(S):

　　　　You are hereby notified a legal action has been filed against you in this Court demanding relief as shown on
the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on
your behalf within 20 days** following the day this paper is delivered to you, judgment by default may be taken against you
for the relief demanded in the attached Complaint.

　　　　The name(s) and address(es) of the party or parties demanding relief against you are shown on the document
delivered to you with this Summons.

Date: **NOV 2 0 2012**, 2_____

DAVID L. NICHOLSON, CLERK

_____ Clerk

By: _____ D.C.

---

**Proof of Service**

This Summons was served by delivering a true copy and the Complaint (or other initiating document) to:

_____

this _____ day of _____, 2_____.

Served by: _____

_____ Title

No. 2CI 06207

**JEFFERSON CIRCUIT COURT**
**DIVISION** _____
JEFFERSON CIRCUIT COURT
DIVISION EIGHT (8)

PAMELA M. EASTRIDGE AS EXECUTRIX
OF THE ESTATE OF JOSEPH E. MORRIS, JR.                          PLAINTIFF

v.

GOODRICH CORPORATION
2730 West Tyvola Rd.
Attn: Vincent Lichtenberger
Charlotte, NC 28217

> **SERVE:**   CSC-LAWYERS INCORPORATING SERVICE CO.
> 421 West Main Street
> Frankfort, KY 40601

AIRCO, INC.
575 Mountain Ave.
Murray Hill, New Jersey 07974

> **SERVE:**   KENTUCKY SECRETARY OF STATE
> State Capitol Building
> Frankfort, KY 40601

AIR PRODUCTS AND CHEMICALS, INC.
7201 Hamilton Blvd.
Allentown, PA 18195

> **SERVE:**   CT CORPORATION SYSTEM
> 306 W. Main St.
> Suite 512
> Frankfort, KY 40601

HONEYWELL, INC.
Individually and as Successor in Interest to
Allied Signal Corp. and Allied Chemical,
101 Columbia Road
Morristown, NJ 07962

> **SERVE:**   KENTUCKY SECRETARY OF STATE
> State Capitol Building
> Frankfort, KY 40601

MOMENTIVE SPECIALTY CHEMICALS, INC.
Individually and as Successor in Interest to Hexion
Specialty Chemicals and Borden Chemical, Inc.
180 East Broad Street
Columbus, OH 43215

      **SERVE:**     NATIONAL REGISTERED AGENTS, INC.
                         400 West Market Street
                         Suite 1800
                         Louisville, KY 40202

CHEVRON U.S.A., INC.
6001 Bollinger Canyon Rd.
San Ramon, CA 94583

      **SERVE:**     THE PRENTICE-HALL CORPORATION SYSTEM
                         421 West Main Street
                         Frankfort, KY 40601

CONOCOPHILLIPS COMPANY
Individually and as Successor in Interest
to Conoco, Inc.
600 N. Dairy Ashford Road
Houston, TX 77079

      **SERVE:**     UNITED STATES CORPORATION COMPANY
                         421 West Main St.
                         Frankfort, KY 40601

OCCIDENTAL CHEMICAL CORPORATION
Individually and as Successor in Interest to Diamond
Chemicals Co., Diamond Shamrock Chemicals Co.,
Diamond Shamrock Corporation, Diamond Alkali Co.,
Hooker Chemicals and Plastics Corporation, Hooker
Chemical Corporation, and Occidental Electrochemicals
Corporation
5005 LBJ Freeway
Dallas, TX 75244

      **SERVE:**     CT CORPORATION SYSTEM
                         306 West Main Street
                         Suite 512
                         Frankfort, KY 40601

2

ETHYL CORPORATION
330 South Fourth St.
Richmond, VA 23219

SERVE:      KENTUCKY SECRETARY OF STATE
State Capitol Building
Frankfort, KY 40601

GEORGIA GULF CORPORATION
Attn: Law Department
115 Perimeter Center Place
Suite 460
Atlanta, GA 30346

SERVE:      KENTUCKY SECRETARY OF STATE
State Capitol Building
Frankfort, KY 40601

GEORGIA-PACIFIC LLC
Individually and as Successor in Interest
to Georgia Pacific Corporation
1209 Orange Street
Wilmington, DE 19801

SERVE:      CT CORPORATION SYSTEM
306 W. Main Street
Suite 512
Frankfort, KY 40601

GULF OIL LIMITED PARTNERSHIP
Individually and as Successor in Interest
to Gulf Oil Corporation
100 Crossing Boulevard
Framingham, MA 01702

SERVE:      CT CORPORATION SYSTEM
306 W. Main Street
Suite 512
Frankfort, KY 40601

3

MONSANTO COMPANY
800 N. Lindbergh Blvd.
St. Louis, MO 63167

     **SERVE:**     CSC – LAWYERS INCORPORATING SERVICE
                          421 West Main Street
                          Frankfort, KY 40601

OLIN CORPORATION
190 Carondelet Plaza
Clayton, MO 63105

     **SERVE:**     CT CORPORATION SYSTEM
                          306 West Main Street
                          Suite 512
                          Frankfort, KY 40601

PANTASOTE, INC.
10 Valley Drive
Greenwich, CT 06830

     **SERVE:**     KENTUCKY SECRETARY OF STATE
                          State Capitol Building
                          Frankfort, KY 40601

PPG INDUSTRIES, INC.
One PPG Place
Pittsburgh, PA 15272

     **SERVE:**     THE PRENTICE HALL CORPORATION SYSTEM
                          421 West Main St.
                          Frankfort, KY 40601

SHELL OIL COMPANY
P.O. Box 2463
Houston, TX 77252

     **SERVE:**     CT CORPORATION SYSTEM
                          306 West Main St.
                          Suite 512
                          Frankfort, KY40601

4

EPEC POLYMERS, INC.
Individually and as a Successor in
Interest to Tenneco Polymers
45 River Road
Flemington, NJ 08822

     **SERVE:**     KENTUCKY SECRETARY OF STATE
                   State Capitol Building
                   Frankfort, KY 40601

TENNECO, INC.
500 North Field Drive
Lake Forest, IL 60045

     **SERVE:**     KENTUCKY SECRETARY OF STATE
                   State Capitol Building
                   Frankfort, KY 40601

AMERICAN CHEMISTRY COUNCIL
700 Second St., NE
Washington, D.C. 20002

     **SERVE:**     KENTUCKY SECRETARY OF STATE
                   State Capitol Building
                   Frankfort, KY 40601

THE DOW CHEMICAL COMPANY
2030 Dow Center
Tax Department
Midland, MI 48674

     **SERVE:**     CT CORPORATION SYSTEM
                   306 West Main St.
                   Suite 512
                   Frankfort, KY 40601

POLYONE CORPORATION
33587 Walker Road
Avon Lake, OH 44012

     **SERVE:**     CT CORPORATION SYSTEM
                   306 West Main St.
                   Suite 512
                   Frankfort, KY 40601

5

THE GOODYEAR TIRE AND RUBBER COMPANY
1144 East Market St.
D/616
Akron, OH 44316

  **SERVE:**  CSC – LAWYERS INCORPORATING SERVICE
        421 West Main Street
        Frankfort, KY 40601

SOCIETY OF THE PLASTICS INDUSTRY
1667 K Street NW
Suite 1000
Washington, D.C. 20006

  **SERVE:**  KENTUCKY SECRETARY OF STATE
        State Capitol Building
        Frankfort, KY 40601

UNION CARBIDE CORPORATION
2030 Dow Center
Midland, MI 48674

  **SERVE:**  CT CORPORATION SYSTEM
        306 W. Main Street
        Suite 512
        Frankfort, KY 40601

MEGGITT SAFETY SYSTEMS
Individually and as Successor in Interest
to Whittaker Corporation
Eric G. Lardiere, Process Agent
1955 Surveyor Avenue
Simi Valley, CA

  **SERVE:**  KENTUCKY SECRETARY OF STATE
        State Capitol Building
        Frankfort, KY 40601

SASOL NORTH AMERICA, INC.
Individually and as Successor in Interest
to Condea Vista Company
900 Threadneedle
Suite 100
Houston, TX 77079

     **SERVE:**    KENTUCKY SECRETARY OF STATE
                  State Capitol Building
                  Frankfort, KY 40601

## COMPLAINT

Comes the Plaintiff, Pamela M. Eastridge as Executrix of the Estate of Joseph E. Morris, Jr., by and through counsel, and for her Complaint, states as follows:

## PARTIES AND JURISDICTION

1.     The Plaintiff, Pamela Eastridge, resided at all relevant times in Campbellsville, Taylor County, Kentucky.

2.     The Decedent, Joseph Morris, Jr., resided at all relevant times in Mt. Washington, Bullitt County, Kentucky.

3.     The Decedent, Joseph Morris, Jr., was diagnosed with a chemical exposure-related cancer, angiosarcoma, on or about June 2011. The Decedent passed away as a result of angiosarcoma on November 3, 2011.

4.     The Plaintiff's Decedent, Joseph Morris, Jr., was at all times relevant hereto, employed by Goodrich Corporation in Louisville, Kentucky. His occupational duties caused him to be exposed to polyvinyl chloride (hereinafter "PVC"), a known carcinogen, manufactured and distributed by the Defendant, Goodrich Corporation.

5.     Plaintiff, Pamela Eastridge, is the natural daughter of Joseph Morris, Jr. Pamela Eastridge was appointed as Executrix of the Estate of Joseph Morris, Jr. on December 1, 2011.

6.      Defendant **GOODRICH CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of New York, with its principal place of business in the state of North Carolina.

7.      The Goodrich Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

8.      Defendant **AIRCO, INC.** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of New Jersey.

9.      Airco, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

10.     Defendant **AIR PRODUCTS AND CHEMICALS, INC.** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Pennsylvania.

11.     Air Products and Chemicals, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

12.     Defendant **HONEYWELL, INC.** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of New Jersey.

8

13.   Honeywell, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

14.   Defendant **MOMENTIVE SPECIALTY CHEMICALS, INC.** is a corporation organized, incorporated and existing under the laws of the State of New Jersey, with its principal place of business in the state of Ohio.

15.   Momentive Specialty Chemicals, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

16.   Defendant **CHEVRON U.S.A., INC.** is a corporation organized, incorporated and existing under the laws of the State of Pennsylvania, with its principal place of business in the state of California.

17.   Chevron, U.S.A., Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

18.   Defendant **CONOCOPHILLIPS COMPANY** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Texas.

19.   Conocophillips Company, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or

otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

20. Defendant **OCCIDENTAL CHEMICAL CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of New York, with its principal place of business in the state of Texas.

21. Occidental Chemical Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

22. Defendant **ETHYL CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of Virginia, with its principal place of business in the state of Virginia.

23. The Ethyl Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

24. Defendant **GEORGIA GULF CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Georgia.

25. The Georgia Gulf Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

26. Defendant **GEORGIA-PACIFIC, LLC** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Delaware.

27. Georgia-Pacific, LLC, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

28. Defendant **GULF OIL LIMITED PARTNERSHIP** is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in the state of Massachusetts.

29. Gulf Oil Limited Partnership, and its predecessor(s), is a limited partnership which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

30. Defendant **MONSANTO CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Missouri.

31. The Monsanto Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

32.     Defendant **OLIN CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of Virginia, with its principal place of business in the state of Missouri.

33.     The Olin Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

34.     Defendant **PANTASOTE, INC.** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Connecticut.

35.     Pantasote, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

36.     Defendant **PPG INDUSTRIES, INC.** is a corporation organized, incorporated and existing under the laws of the State of Pennsylvania, with its principal place of business in the state of Pennsylvania.

37.     PPG Industries, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

38.     Defendant **SHELL OIL COMPANY** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Texas.

39.     Shell Oil Company, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

40.     Defendant **EPEC POLYMERS, INC.** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of New Jersey.

41.     EPEC Polymers, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

42.     Defendant **TENNECO, INC.** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Illinois.

43.     Tenneco, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

44.     Defendant **AMERICAN CHEMISTRY COUNCIL** is a trade organization organized, incorporated and existing under the laws of the State of Pennsylvania, with its principal place of business in the District of Columbia.

13

45.    The American Chemistry Council, and its predecessor(s), is a trade organization which is and has been engaged in promoting the interests of manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens, and in lobbying efforts to conceal the dangers of PVC.

46.    Defendant **DOW CHEMICAL COMPANY** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Michigan.

47.    Dow Chemical Company, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

48.    Defendant **POLYONE   CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of Ohio, with its principal place of business in the state of Ohio.

49.    Polyone Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

50.    Defendant **THE GOODYEAR TIRE AND RUBBER COMPANY** is a corporation organized, incorporated and existing under the laws of the State of Ohio, with its principal place of business in the state of Ohio.

14

51.     The Goodyear Tire and Rubber Company, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

52.     Defendant **SOCIETY OF THE PLASTICS INDUSTRY** is a trade organization organized, incorporated and existing under the laws of the State of Pennsylvania, with its principal place of business in the District of Columbia.

53.     Society of the Plastics Industry, and its predecessor(s), is a trade organization which is and has been engaged in the study of manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens, and in lobbying efforts to conceal the dangers of PVC.

54.     Defendant **UNION CARBIDE CORPORATION** is a corporation organized, incorporated and existing under the laws of the State of New York, with its principal place of business in the state of Michigan.

55.     Union Carbide Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

56.     Defendant **MEGGITT SAFETY SYSTEMS, INC.** is a corporation organized, incorporated and existing under the laws of the State of California, with its principal place of business in the state of California.

57.    Meggitt Safety Systems, Inc., and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

58.    Defendant **SASOL NORTH AMERICA, INC.** is a corporation organized, incorporated and existing under the laws of the State of Delaware, with its principal place of business in the state of Texas.

59.    Union Carbide Corporation, and its predecessor(s), is a corporation which is and has been engaged in the manufacturing, refining, producing, selling, distributing, marketing and/or otherwise placing into the stream of commerce, PVC and PVC-containing products, known carcinogens.

60.    The amount in controversy exceeds $5,000.00 exclusive of costs, interest and disbursements, the jurisdictional limit of this court.

61.    This Court has personal jurisdiction over the Defendants under KRS 454.210 (the Long Arm Statute) as these Defendants have systematically and continuously transacted business in this state, either themselves or through the control of their subsidiaries, and supplied their products in this state.   Moreover, this Court has specific personal jurisdiction over the Defendant, Goodrich Corporation, by virtue of Joseph Morris, Jr.'s exposure to Goodrich Corporation's defective, unreasonably dangerous and ultra hazardous products in the State of Kentucky.

## FACTUAL BASIS OF CLAIM

62.    Plaintiff's Decedent, Joseph Morris, Jr., in his employment, was exposed, both directly and indirectly, in the manner described herein, by means of inhalation and dermal absorption (from direct dermal contact with said product and/or dermal contact with clothes

16

contaminated by said product, to PVC and PVC-containing products, carcinogenic products distributed, marketed and/or manufactured by the Goodrich Corporation from approximately 1964 to 2005.

63.     Plaintiff's Decedent's last exposure to PVC and PVC-containing products at the Goodrich Corporation's Louisville facility came in the 1980's.

64.     As a direct and proximate cause of his exposure to vinyl chloride ("VC"), Joseph Morris, Jr. contracted angiosarcoma of the liver (liver cancer).   He was diagnosed in June 2011 and died a painful, premature and wrongful death on November 3, 2011.   Prior to his death, Plaintiff's decedent incurred substantial medical expenses, suffered severe pain of mind and body, disability, limitation and loss of the pleasure of life.   In addition, he lost the pleasures of the longer and fuller life he otherwise would have enjoyed, all as a direct and proximate result of the conduct of the Defendants herein.

65.     At all times material hereto, the Plaintiff's Decedent, Joseph Morris, Jr., was employed by Goodrich Corporation at its facility in Louisville, Kentucky.

66.     Plaintiff's Decedent, Joseph Morris, Jr., engaged, as a condition of his employment, in working in, around, near and being exposed, to PVC and PVC-containing products, manufactured, produced, processed, compounded, converted, sold, distributed, marketed, supplied and/or placed into the stream of commerce by the Defendant, Goodrich Corporation, or its predecessor.

67.     Vinyl chloride is a man-made compound processed into PVC, whose use as a white plastic pipe is but one of hundreds of known applications.   The Defendant, Goodrich Corporation, and its predecessors have for many years manufactured, sold, distributed or otherwise placed in the stream of commerce PVC and PVC-containing products, known carcinogens.

68.     Goodrich Corporation possessed medical and scientific data, along with other knowledge, which clearly indicated that VC and other related chemicals, including ethylene dichloride, was hazardous to the health and safety of its employees, including Joseph Morris, Jr., who were required to work with and around these chemicals.

69.     Plaintiff specifically alleges Defendant, Goodrich Corporation, was aware of the following facts by at least the early 1970's:

a.      That VC is a multi-potential carcinogen, a carcinogen which is capable of causing different types of cancer at different sites of the human body.

b.      That between 1966 and 1971, employees at other VC-processing facilities had, without their knowledge, been the subject of secret epidemiological studies conducted by the University of Michigan.   These studies had revealed significant systemic "vinyl chloride disease" occurring among these employees (with symptoms such as "acroosteolysis," Raynaud's syndrome and pseudo-scleroderma), indicative of extreme overexposures to vinyl chloride.

c.      That, by reason of the extreme overexposures to vinyl chloride which had resulted in the occurrence of VC disease in these employees, other employees in similar jobs, including Joseph Morris, Jr., were at extreme risk of contracting liver and other cancers such as those demonstrated to have occurred in secret animal studies initiated in the late 1960's as part of a toxicological investigation of VC disease conducted under the auspices of the European VC and PVC manufacturers.

d.      That the multi-potential carcinogenicity of vinyl chloride had been demonstrated in numerous animal toxicological studies and bioassays conducted under the auspices of European VC and PVC manufacturers which this and other defendants promised to keep secret and did keep secret from the U.S. government, from Joseph Morris, Jr. and others similarly situated, and from

18

the public at large.

e.     That VC had in fact already been found to be associated with cancer, including liver cancer, as well as other adverse health effects among workers employed in the vinyl industry, and even that vinyl chloride had caused liver cancer and/or other known injuries in employees at the Goodrich Corporation's Louisville facility.

f.     That the U.S. governmental agencies regulating exposure of American workers (Department of Labor and OSHA) and the American public at large (EPA, CPSC, etc.) were completely unaware of the secret European studies demonstrating the association between exposure to vinyl chloride and the development of cancer.

g.     That the information regarding the health effects of vinyl chloride which the Defendants, individually and through their trade association, the Manufacturing Chemists Association, were furnishing to the U.S. government on a more or less continuous basis was incomplete and deliberately misleading with regard to the state of their knowledge and the carcinogenic potential of VC and that the government would be misled and lulled into inaction by their deliberate omission of any reference to the secret European animal studies.

h.     That after 1974, VC was and had been reported in the toxicological and epidemiological literature to be a multi-potential carcinogen.   Goodrich Corporation was aware of such studies, reviewed such studies in detail and, upon information and belief, secretly (from its employees' perspective) conducted epidemiological studies of VC and PVC workers, which showed a statistically significant increased development of a wide variety of cancers in workers exposed to VC the vinyl industry for more than one year, including liver cancer.

i.     That Mr. Morris and the other employees at the Goodrich Corporation's Louisville facility were completely unaware of any workplace studies or their results.

j.      That the information Goodrich Corporation was providing to its employees, to the government and to the general public concerning the health risks associated with exposure to vinyl chloride was false, incomplete and intentionally and fraudulently misleading and cynically reassuring.   In order to conceal the true facts from its employees, the government and the general public, Goodrich Corporation told its employees and the public only enough about the link between VC exposure and "cancer" to assuage any concerns which might arise from the mere use of the word in labels Defendants were eventually forced by the government to place on some of their products (and then fraudulently removed from many of them).   If employees were told anything, they were generally told no more than that vinyl chloride had been reported to be associated with an extremely rare form of liver cancer, angiosarcoma, due to the levels of exposure much higher than they were likely to encounter or have encountered, and nothing more.

k.      That the information Goodrich Corporation provided its employees and the general public with regard to the extent and nature of their known (from the perspective of Goodrich) exposure to VC and other carcinogenic chemicals was false, intentionally inaccurate, fraudulently misleading and cynically reassuring.

l.      That the truth about the cancer risk of vinyl chloride and the truth about the nature and extent of its employees' (and the general public's) exposure to the VC Goodrich emitted into the air would be bad for its business in general and for its labor, governmental and public relations in particular.

70.     All of the foregoing knowledge was fraudulently withheld and concealed from Mr. Morris and his co-workers, with the specific intent that they, the government and the public should be and remain ignorant of the true facts regarding the carcinogenic chemicals Goodrich Corporation exposed workers to at its Louisville facility.   This resulted in Mr. Morris being

intentionally exposed to dangerous amounts of VC without his informed consent.   It further made it substantially certain that Mr. Morris would be injured through VC exposure and he was eventually injured and prematurely and painfully died as a result of the foregoing.

71.     The amount of VC emitted into the work environment at Goodrich's Louisville facility in the course of the facility's production of PVC and other plastics significantly exceeded the legally permitted limits and does on exposure set by OSHA.   VC is a colorless gas and can remain in a gaseous state at normal temperatures.

72.     While employed at Goodrich's Louisville facility, Plaintiff's Decedent, Joseph Morris, Jr., was exposed to significant doses and/or levels of VC far beyond those levels and doses permitted by OSHA standards.

73.     Goodrich Corporation knew of the existence of the high levels/doses of VC and the fact that the levels of VC were far in excess of permitted OSHA levels.   Further, Goodrich Corporation had the following responsibilities and/or actually undertook to perform the following duties:

a.     To provide the planning, inspection, approval and supervision of the work of Plaintiff's Decedent and his co-employees.

b.     To see that proper safety rules were adopted, promulgated and enforced as concerned the use of appropriate safety equipment and procedures.

c.     To see that Plaintiff's Decedent and his co-employees performed the duties pertaining to his work in a proper, safe and workmanlike manner.

d.     To see that Plaintiff's Decedent and his co-employees used safe and sound principles and practices in his work.

e.     To test Plaintiff's Decedent's work environment for the presence of hazardous

chemicals.

      f.     To make health and hygiene decisions on any and all questions regarding safety, industrial hygiene, industrial medicine, and the formulation and implementation of safety, industrial hygiene, and industrial medicine programs and the use of protective devices.

      g.     To keep abreast of state of the art knowledge as it pertains to hazardous chemicals, safety, and industrial hygiene.

      h.     To provide adequate warnings, instructions, physical examinations, safety equipment, ventilation, and breathing apparatuses, where such were necessary in order to prevent Plaintiff's Decedent from being harmed by exposure to pollution in the environment in which he was required to work.

      i.     To make certain that employees, including Plaintiff's Decedent, were provided a safe working environment and/or a safe place to work.

      j.     To comply with all applicable State and Federal regulations related to workplace exposure (including, but not limited to, those regulations promulgated by the U.S. Department of Labor pursuant to the Walsh-Healy Public Contracts Act and the Occupational Safety and Health Act).

      k.     To provide Plaintiff's Decedent with a safe place to work by the formulation of policies and adoption of plans for all phases of accident and injury prevention.

      74.     The Defendant, Goodrich Corporation, knew that in the ordinary and foreseeable handling of PVC and PVC-containing products, PVC fumes would be discharged in the air, inhaled, ingested and come into dermal contact with individuals working with the products, such as Plaintiff's Decedent, Joseph Morris, Jr.

75.     The Defendant, Goodrich Corporation, knew that Plaintiff's Decedent and other workers who were exposed to their PVC and PVC-containing products, would inhale, ingest and come into dermal contact with substantial amounts of PVC.

76.     For many years the Defendant, Goodrich Corporation, had in its possession and readily available to it, both actually and constructively, medical and scientific information alerting it to the grave dangers inherent to PVC and PVC exposure through PVC-containing products, including those to which Plaintiff was exposed, such dangers including, the risks of: angiosarcoma and other cancers, malignancies and maladies.

77.     The Defendant, Goodrich Corporation, has known for many years that persons such as the Plaintiff's Decedent, Joseph Morris, Jr., would be exposed to dangerous and hazardous amounts of PVC during the ordinary course of their work at its Louisville facility and that individuals such as Morris would suffer significant injury of death from such exposure.

78.     The Plaintiff's Decedent was required to work with and around PVC and PVC-containing products which were in a defective condition unreasonably dangerous to the Plaintiff's Decedent, Joseph Morris, Jr.

79.     The Defendant failed to warn and/or inadequately warned of the dangerous and hazardous nature of its PVC-containing products.

80.     Persons such as the Plaintiff's Decedent did not know of the nature and extent of the danger presented by the ordinary and foreseeable use of Defendant's PVC-containing products.

81.     Many other workers at the Goodrich Corporation's Louisville facility were also exposed to these high levels of VC.  Upon information and belief, they too have suffered premature death and severe, disabling and permanent injuries as a result of such exposure to VC.

23

## FACTS SPECIFIC TO CONSPIRACY

82.     Various vinyl chloride and polyvinyl chloride manufacturers ("Industry")[1],
including the Goodrich Corporation, with and through their trade associations, engaged in a
deliberate attempt to conceal and misrepresent the true nature and extent of health hazards caused
by vinyl chloride exposure. The relevant trade associations are the Manufacturing Chemists
Association (MCA, renamed The Chemical Manufacturers Association (CMA)), Society of
Plastics Industries (SPI), and the Vinyl Chloride Safety Association (VCSA). The concerted effort
was designed to conceal and misrepresent health hazards related to vinyl chloride exposure from
the government, workers, and the public.

83.     In 1953, MCA published the first chemical safety data sheet for vinyl chloride,
known as SD-56. Despite the fact that reasonable research and studies had not been done
concerning vinyl chloride and despite the fact that vinyl chloride had been produced for decades,
the MCA data sheet misrepresented that vinyl chloride was a relatively safe chemical as far as
exposure. This 1953 chemical safety data sheet was approved by various Industry members and
was not revised until 1972, although Industry amassed a plethora of information concerning the
hazards of vinyl chloride during those nineteen years.

84.     In addition to the information available from abroad concerning health problems in
vinyl chloride workers, Industry was aware by at least 1959 through animal studies that workers
were being exposed to unsafe levels of vinyl chloride monomer.

85.     As a result of the 1959 studies, the American Conference of Governmental
Industrial Hygienists (ACGIH), a private and underfunded organization, recommended that the
threshold limit value or TLV (exposure level) for vinyl chloride monomer be reduced from 500
parts per million (ppm) to 50 ppm. However, this recommendation was never published by

---

[1] The Defendants will be referred to collectively as "Industry".

ACGIH. The reason given for the lack of publication was that the Industry deliberately caused to be published a study in 1963 that attempted to show that 500 ppm was an acceptable level. There was obvious direct and indirect influence of Industry on such consensus setting bodies as ACGIH, who were supposed to be independent. In fact, Dow Chemical's V. K. Rowe participated in the ACGIH TLV Committee as an *ex officio* member.

86.     Despite the knowledge of Industry by at least 1959 concerning potential hazards associated with vinyl chloride exposure, Industry continued to manufacture VC for use as a propellant in aerosols. Although Dow Chemical was aware from its own research that VC should not be used as an aerosol propellant, Allied Chemical bought aerosol grade VC from Dow Chemical as late as 1973. In addition, various other Industry members sold VC for use as a propellant in aerosols throughout the 1960's and early 1970's. When Industry realized in 1970 that cancers had been found in animals exposed to VC, VC was still marketed for use in aerosol production. When Industry found further evidence that cancer was being found in animals exposed to VC in November 1972, Industry wanted to get out of the aerosol market, but they did not want to call attention to the cancer aspect of VC, and thus did nothing.

87.     In the late 1950's and early 1960's, BFGoodrich (BFG) was aware of a problem of bone degeneration in workers exposed to VC; this problem was called acroosteolysis. With and through MCA, Industry did its best to squelch publicity concerning acroosteolysis and squelch the fact that acroosteolysis was an occupational disease related to VC exposure. For example, workers were examined or x-rayed "quietly" without reference to the problem and "incidental" to other examinations. Dr. Rex Wilson, Medical Director of BFG, went to Europe to stop a publication of a European doctor concerning acroosteolysis. Further, when the University of Michigan studied acroosteolysis and recommended in 1969 an industry-imposed 50 ppm VC exposure standard (ten

times less than the existing 500 ppm TLV), Industry specifically deleted this recommendation from any published report.

88.     In 1970, Industry learned that a European scientist, Dr. Viola, had found cancer in laboratory animals exposed to VC. These were the exact same acroosteolysis studies that the VC industry had recommended doing in 1966 but never did. Moreover, Industry received unpublished information from Viola that he had seen these cancers at less than 5,000 parts per million. The published figure was 30,000 parts per million.

89.     Thus, the U.S. industry had information that cancer was being reproduced in laboratory animals exposed to VC at levels around the level at which humans could smell VC, i.e., the odor threshold of 4,000 parts per million. Industry was specifically worried that publishing Viola's work in the United States could cause serious problems for the VC/PVC industry.

90.     In November, 1972, United States companies entered into a secrecy agreement with European companies to keep secret the research conducted by another Italian scientist, Dr. Maltoni, which demonstrated that animals exposed to concentrations of VC as low as 250 ppm developed cancer. This time, the cancers were angiosarcoma of the liver, which also appear in humans. As of this time, had Industry looked, workers exposed to VC had already died of angiosarcoma of the liver. In fact, Dr. Creech of BFG had diagnosed angiosarcoma in a worker exposed to VC in 1970.  However, Dr. Creech did not have the other corroborating information that would have been provided by a study such as Maltoni's. Therefore, the relationship between angiosarcoma of the liver and VC exposure was not publicized until after January 1974.

91.     The secrecy agreement between the Europeans and the U.S. companies had an unlimited term. There are references in 1974 and 1975 of the secrecy agreement still being in effect. In addition, the secrecy agreement did not make a provision for telling the United States

26

government, the public, or workers. Specific memoranda stated that workers and the government could not be told. Although Industry professes that they finally told the government in July 1973 of Maltoni's work, government representatives have sworn under oath that this never happened.

92.     Industry belatedly performed its own research concerning VC and cancer. Although Industry had recognized the need to do animal studies concerning cancer since the time they had Viola's data in 1970, the exposure of animals in the U.S. study did not occur until 1973. Further, Industry had a stated purpose of refuting the animal work in Europe, as opposed to complimenting the European work.

93.     In addition, Industry recognized early on in the 1970's the need to study workers in the VC industry for evidence of cancer. However, this epidemiology work was postponed.   It was not officially begun until Industry was sufficiently scared that they would be accused of failing to address the cancer aspect of VC, in approximately June 1973. When Industry finally began epidemiology studies, the studies were conducted fraudulently in an attempt not to find cancer related to vinyl chloride exposure. The Industry goal was to substantiate the Industry position that VC only caused angiosarcoma of the liver at very high levels of VC exposure.

94.     This epidemiology work was performed by various contractors; all the while, Industry made substantive changes and revisions to the contractors' reports. In addition, Industry specifically recognized that the studies failed to study certain workers and facilities where cancer most likely existed. The Industry-sponsored studies specifically excluded old plants and workers at said plants, where cancer would most likely have been seen.

95.     When the U.S. industry finally decided to do epidemiology work and animal work on vinyl chloride, Industry specifically defocused the cancer aspect of the work. In a press release by MCA concerning the animal work, Industry decided that the work would be referred to as a

27

chronic inhalation study, with no mention of cancer. This was despite the stated internal purpose of the study being a cancer study. Further, when MCA issued a press release concerning the epidemiology study, cancer was not mentioned. MCA minutes specifically stated the need to "defocus" carcinogenicity.

96.     When a permanent standard concerning VC was considered by OSHA in 1974, Industry specifically misrepresented the historical knowledge and hazards concerning VC. Further, Industry developed a united front through SPI that the permanent standard would "shut down" Industry. This was despite internal knowledge that some of the Industry members could abide by the permanent standard. Further, it was despite knowledge that some members of Industry really did not know whether they could live with the permanent standard because they had not tried or even ordered the equipment. Various Industry personnel gave false statements to OSHA concerning VC.

97.     Industry has continually spouted the Industry line that vinyl chloride only causes angiosarcoma at high long-term levels of VC exposure. This is despite internal Industry documents recognizing that Industry studies showed that VC causes other cancers such as brain cancer and primary liver cancer. Industry specifically notes the need for studies to defend lawsuits.

98.     Industry conspired to conceal the carcinogenicity of VC. They hid information proving that exposure to VC could be lethal, choosing instead to expose workers such as Joseph Morris, Jr. to lethal levels of VC knowing it would cause injury and death.

## CLAIMS FOR RELIEF

### COUNT I -- NEGLIGENCE

99.     The Plaintiff restates each allegation contained in Paragraphs 1 - 98 as though restated herein in full.

100.    The aforesaid action of the Defendants constitute negligence in that there has been a failure to use reasonable and ordinary care under the circumstances, and this failure has been the proximate cause of the bodily harm and death suffered by the Plaintiff's Decedent.

101.    As the direct and proximate result of the aforesaid negligence, failures and omissions of the Defendants, the Plaintiff's Decedent was caused to contract and suffer disease, including angiosarcoma, and injury to his body, including the systems, organs and tissues therein, as well as extremely painful, humiliating and debilitating medical procedures necessary for the treatment of his injuries and disease, causing him pain, suffering, mental anguish and humiliation.

102.    As the direct and proximate result of the aforesaid negligence, failures and omissions of the Defendants, the Plaintiff's Decedent, Joseph Morris, Jr., died as a result of angiosarcoma.

## COUNT II – STRICT LIABILITY
### (Failure to Warn)

103.    Plaintiff restates each allegation contained in Paragraphs 1 - 102 as though stated herein in full.

104.    At all times relevant herein, the Defendants were engaged in the business of designing, developing, testing, manufacturing, marketing, distributing and selling VC and VC-containing products.

105.    Defendants had a duty to place into the stream of commerce, manufacture, distribute, market, promote and sell the VC and VC-containing products in such a condition that they were neither defective nor unreasonably dangerous when put to the use for which they was designed, manufactured, distributed, marketed and sold.

106. Defendants knew and expected that Plaintiff's Decedent would be exposed to the VC and VC-containing products it was manufacturing, designing, selling, distributing, marketing and/or promoting without substantial change in the products' condition.

107. At the time the Plaintiff's Decedent was exposed to the VC and VC-containing products, the products were in a defective and/or unreasonably dangerous condition.

108. Plaintiff could not have discovered any defect in the VC and VC-containing products through the exercise of due care.

109. Defendants, as a designer, manufacturer, marketer and distributor of chemicals, is held to a level of knowledge of an expert in its field.

110. Plaintiff's Decedent did not possess the same or substantially the same knowledge as the Defendants.

111. The VC and VC-containing products were unreasonably dangerous and Defendants knew or should have known they were in an unreasonably dangerous condition. Therefore, Defendants should not have manufactured, marketed, distributed, sold and/or placed the products into the stream of commerce. Indeed, a reasonable and prudent manufacturer aware of the dangerous condition of the products, would not have marketed, distributed, sold and/or placed the product into the stream of commerce.

112. Plaintiff's Decedent was and is in the class of persons that Defendants should have considered to be subject to the harm caused by the defective and dangerous condition of the VC and VC-containing products.

113. Defendants knew or should have known that the VC and VC-containing products created a high risk of bodily injury and serious harm.

114.   Defendants failed to provide adequate and timely warnings or instructions regarding the safe use of its VC and VC-containing products.

115.   As the direct and proximate result of the aforesaid wrongful conduct, failures and omissions of the Defendants, the Plaintiff's Decedent died of angiosarcoma.

### COUNT III – STRICT LIABILITY
**(Design Defect)**

116.   Plaintiff restates each and every allegation contained in Paragraphs 1 - 115 above as though restated in full herein.

117.   Defendants designed, manufactured and supplied VC and VC-containing products and placed these products into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

118.   The VC and VC-containing products were defective in design or formulation because they were unreasonably dangerous and more dangerous than the ordinary person would expect.

119.   The VC and VC-containing products were defective due to inadequate design, inadequate warnings, inadequate testing or study, and inadequate reporting of the results of the testing of the VC and VC-containing products.

120.   The VC and VC-containing products were defective due to inadequate warnings or instructions after Defendants knew or had reason to know of the risk of injury from the VC and VC-containing products.  Defendants failed to provide adequate warnings to the Plaintiff and required for many years that he work with and around the VC and VC-containing products without taking adequate safety precautions.

31

121.     As the direct and proximate result of the aforesaid wrongful conduct, failures and omissions of the Defendants, the Plaintiff's Decedent died of angiosarcoma.

### COUNT IV – INTENTIONAL TORT

122.     The Plaintiff restates each allegation contained in Paragraphs 1 - 121 as though restated herein in full.

123.     The aforesaid actions of the Defendants constitute an intentional tort, as there has been a deliberate and intentional use of VC after Defendants knew VC exposure could cause injury and death.   This intentional tort, includes causing Plaintiff, deliberate and intentional, exposure to VC in violation of both common law duties and regulations.

124.     As the direct and proximate result of the aforesaid wrongful conduct, failures and omissions of the Defendants named herein, the Plaintiff's Decedent died of angiosarcoma.

### COUNT V – TORT OF OUTRAGE

125.     The Plaintiff restates each allegation contained in Paragraphs 1 - 124 as though restated herein in full.

126.     The Defendants acted intentionally and recklessly in exposing Plaintiff's Decedent to VC and VC-containing products knowing such products would cause severe injury or death to Plaintiff's Decedent and other workers.

127.     As the direct and proximate result of the aforesaid wrongful conduct, failures and omissions of the Defendants, the Plaintiff's Decedent suffered emotional distress, bodily injury and death.

### COUNT VI – CONSPIRACY

128.     The foregoing actions of the Defendants constitute intentional torts under Kentucky law on Joseph Morris, Jr., including but not limited to battery and fraudulent misrepresentation.

Although Joseph Morris, Jr. voluntarily went to work, through the Defendants' intentional and/or willful acts, along with and through their trade associations, he was unaware of the true dangers associated with VC and was unaware of the true nature and extent of the risks associated with working in a place polluted with VC. Thus, Joseph Morris, Jr. and other VC workers were intentionally overexposed to VC without their informed consent. Any consent to work by Joseph Morris, Jr. and other VC workers was vitiated by the Defendants', along with and through their trade associations, intentional and/or willful acts concerning the concealment, misrepresentation, and manipulation of scientific, medical, and other data indicating the dangerous propensities of VC and VC exposure. Such unconsented exposure to VC by Joseph Morris, Jr. and other VC workers constituted an intentional infliction of harmful and/or offensive contact to the person of Joseph Morris, Jr. without his consent by the Defendants, along with and through their trade associations. These Defendants therefore conspired to commit the intentional tort of fraudulent misrepresentation which caused physical harm and other damages to Joseph Morris, Jr. and the intentional tort of battery. Further, as a proximate result of the intentional and willful acts of the Defendants, along with and through their trade associations, Joseph Morris, Jr. and the other workers in the VC industry were intentionally deprived of knowledge with which to make an educated decision regarding exposure to VC, were intentionally and/or willfully overexposed to VC, were intentionally and/or willfully deprived of adequate medical monitoring for VC exposure, were intentionally and/or willfully deprived of needed safety equipment concerning VC exposure, were intentionally and/or willfully deprived of engineering controls to reduce VC exposure, and were intentionally and/or willfully influenced to think that they were working in a safe environment and were not being harmed. Therefore, as a result of the intentional and/or willful acts of concealment, misrepresentation and manipulation, the Defendants, along with and through

33

their trade associations, knew that it was substantially certain that Joseph Morris, Jr. and other similarly situated would be harmed and sustain injury and disease as a result of their exposure to vinyl chloride, including the injury and disease of angiosarcoma.

129.     The following tortious acts were committed on Joseph Morris, Jr. by at least one Defendant, were lawfully committed by none of the Defendants, and were a factual and legal cause of his contracting angiosarcoma.

a.     Intentionally and willfully exposing Joseph Morris, Jr. to VC without his informed consent, thereby intentionally inflicting unconsented harmful or offensive contact upon Joseph Morris, Jr.

b.     Inducing Joseph Morris, Jr. to work in an environment that was hazardous to his health.

c.     Failing to provide adequate protection to reduce or eliminate the dangerous effects of VC.

d.     Failing to provide warnings to Joseph Morris, Jr. regarding the dangers and ill health effects of exposure to VC.

e.     Failing to provide adequate medical monitoring in the VC workplace.

f.     Failing to provide an accurate industry standard for monitoring safe levels of VC exposure.

g.     Failure to reasonably test or investigate the dangerous propensities associated with VC.

h.     Participating in an industry-wide effort to fail to reasonably test or investigate the potential adverse health effects posed by the use of VC in the workplace, including the concerted effort to misrepresent, misclassify, alter, and suppress epidemiological and toxicological studies,

34

data, and other information concerning the carcinogenicity of VC.

     i.    Participating in an industry-wide effort to consciously fail to ward Joseph Morris, Jr. and other vinyl workers of the potential cancers and/or ill health effects associated with exposure to VC, including misrepresentation, misclassification, alteration, and suppression of epidemiological and toxicological studies, data and other information relating to the carcinogenicity of VC.

     j.    Participating in an industry-wide effort to improperly influence, manipulate, alter, and misclassify epidemiological and toxicological data and scientific findings as reported by research concerning the health risks of VC in the medical and trade literature.

     k.    Participating in a concerted effort to prevent workers like Joseph Morris, Jr. from learning that they themselves were members of an industry-sponsored epidemiological study of cancer in the vinyl industry. As an example, the CMA's fraudulent epidemiologic studies conducted from 1973 to the present have been consistently represented to be "Industry Wide" studies. However, in truth the Defendants deliberately excluded many of the oldest plants and heavily exposed workers from the study.

     l.    Participating in an effort to "keep the lid" on the knowledge concerning the carcinogenicity of VC that could be obtained by the workers, the government, and the general public.

     m.    Participating in a concerted effort to continue the manufacture, marketing and distribution of a knowingly defective product.

     130.    Each of the foregoing tortious acts listed in the preceding paragraphs were performed by the Defendants:

     a.    In concert with each other.

b. Pursuant to a common design.

c. Under the knowledge of each Defendant that the other Defendants' conduct constituted a breach of duty to which each Defendant gave substantial assistance or encouragement.

d. With a substantial assistance from the other Defendants to accomplish the tortious result of harming Joseph Morris, Jr., with substantial assistance constituting a breach of duty by each conspiring Defendant to Joseph Morris, Jr.

131. As such, all Defendants are liable individually, jointly, and jointly and severally for the actions and inactions of the other Defendants.

132. The foregoing intentional and/or willful acts and/or intentional torts described in the paragraphs above by the Defendants, along with and through their trade associations, were substantial contributing causes to Joseph Morris, Jr. being exposed to hazardous levels of VC and eventually contracting angiosarcoma. As such, the Defendants and their trade associations are liable individually, jointly, and jointly and severally as co-conspirators for the damages caused to Joseph Morris, Jr. as a result thereof, as set forth in the above paragraphs.

133. Defendants were active participants in an industry-wide conspiracy to conceal and misrepresent the nature and extent of the health hazards potentially posed by exposure to VC and the potential risk posed to workers in the American vinyl industry, including the manufacture and use of VCM, polyvinyl chloride and products derived therefrom.

134. That as a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Defendants mentioned above, the Plaintiff's Decedent, prior to his death, was exposed to and inhaled, ingested or otherwise absorbed great amounts of vinyl chloride, causing Plaintiff's Decedent to develop angiosarcoma, which disabled and disfigured the

Plaintiff's Decedent and ultimately led to his death on November 3, 2011.

135.    As a result of the actions of the Defendants and their trade associations — conspiring with each other and coordinating with each other and amongst themselves to commit intentional and/or willful acts described herein – these Defendants are liable individually, jointly, and jointly and severally as co-conspirators for the damages caused to Joseph Morris, Jr., including but not limited to loss of future earning capacity, past medical expenses, mental and physical pain and suffering and punitive damages.

## COUNT VII – PUNITIVE DAMAGES

136.    The Plaintiff restates and realleges each allegation contained in Paragraphs 1 – 135 as though restated herein in full.

137.    The aforesaid actions of the Defendants constitute malicious willful and wanton conduct and gross negligence making it liable to the Plaintiff for punitive damages.

138.    As a direct and proximate result of the aforesaid willful and wanton conduct, gross negligence, failures and omissions of the Defendant, the Plaintiff's Decedent, Joseph Morris, Jr., was caused to contract and suffer disease, including angiosarcoma and injury to his body, including the systems, organs and tissues therein, as well as extremely painful, humiliating and debilitating medical procedures necessary for the treatment of his injuries and disease, causing him pain, suffering, mental anguish and humiliation.

139.    As a direct and proximate result of the aforesaid willful and wanton conduct, gross negligence, failures and omissions of the Defendant, the Plaintiff's Decedent died of angiosarcoma.

WHEREFORE, the Plaintiff, Pamela Eastridge, Individually and as Executrix of the Estate of Joseph Morris, Jr., demands judgment against the Defendants for an amount in excess of $5,000 for both compensatory for both compensatory damages, including damages for the destruction of the Plaintiff's Decedent' power to labor and earn money, (including all future loss of pension benefits, Social Security benefits or any other economic loss), medical expenses, consequential damages and punitive damages, costs of the actions, and all relief to which she may appear entitled, including trial by jury of all issues so triable.

Respectfully submitted,

SALES, TILLMAN, WALLBAUM,
CATLETT & SATTERLEY

Kenneth L. Sales
David G. Bryant
1900 Waterfront Plaza
325 West Main Street
Louisville, KY 40202
Telephone: (502) 589-5600
**COUNSEL FOR PLAINTIFF**

## VERIFICATION

I, Pamela Eastridge, state that I am the Plaintiff in this action and that the statements and allegations contained in this Complaint are true to the best of my knowledge and belief.

_Pamela M Eastridge_
PAMELA EASTRIDGE

STATE OF KENTUCKY
COUNTY OF _Jefferson_

Subscribed and sworn to before me by Pamela Eastridge on this 13th day of _April_, 2012.

My commission expires _10-12-14_

_Dippie Sermento_
Notary Public